## Case No. 13,349.

### STEELMAN v. TAYLOR.

[3 Ware, 52; [1] 19 Law Rep. 36.]

District Court, D. Massachusetts. March, 1856.

AFFREIGHTMENT—DIMINUTION DURING CARRIAGE—SHIPPING—CLAIM FOR SHORTAGE—USAGE.

1. Quære, how far the responsibility of a master of a vessel, for the accuracy of the accounts of the lading and delivery of a cargo, may be affected by the usage of a particular trade.

2. In a common contract of affreightment, the master is entitled to full freight on all the goods laden and borne on the bill of lading, though they may be by natural causes, and without his fault, deteriorated in quality, or diminished in quantity when delivered.

[Cited in brief in The Muriel, Case No. 9,944.]
[Cited in Gage v. Libby, 14 Allen, 263.]

In admiralty.

J. A. Loring, for libelant.
Mr. Mackie, for respondent.

WARE, District Judge. This is a libel for freight claimed to be due on a cargo of coal, shipped at Philadelphia in the schooner Mesrole, for Fall River. According to the bill of lading, one hundred and nineteen tons were laden, while but one hundred and ten and a fraction ($105/_{2246}$) were delivered, the delivery falling short nearly nine tons; the consignee refuses to pay freight for more than was delivered, and claims to charge against the freight on the one hundred and ten tons, the price of the nine tons short delivery. It is stated by Mr. Dunn, a witness examined for the respondent, that there is usually a loss of about one per cent, on hard coal, like this cargo, by the degradation and waste of the coal in loading and unloading. But making this allowance, there will still remain a deficiency of about seven and a half tons.

It was not questioned at the hearing but that all the coal that was actually laden at Philadelphia, was delivered at Fall River; and the difference between the two accounts of the lading and the delivery, can only be explained by an error in the one account or the other; either there must have been an overcharge in the account of the lading, or an error the other way in the amount of the delivery.

To prove the correctness of the bill of lading, the master has taken the depositions of two witnesses at Philadelphia, Myers, the superintendent of the wharf where the coal was taken into the vessel, and Kennedy, the weigh-master, who weighed it and kept the tally. The coal was brought to the scales in barrows, where it was weighed, and thus transported to the vessel in the barrows. Each barrow contained two hundred and twenty-four pounds when it was passed into the vessel. Kennedy noted each one as it was weighed in his tallying. This was kept in a book used for that purpose, and a copy

of it is annexed to his deposition. The number of barrows marked gives one hundred and twenty-three and a half tons, in which there were four and a half tons of waste and screenings, and these being deducted leave one hundred and nineteen tons net. This was the only account taken. The mate was on board the whole time, and the master occasionally, while the coal was taken in, which occupied the time from 11 a. m. to 4 p. m. It is ordinarily the duty of the mate to take the account of the cargo as it is received; but if he neglects to do it with the master's knowledge, the master must be held responsible for the correctness of the account, by whomsoever it is taken, as he, in the bill of lading adopts it. In this case the account was taken by the servant of the vendor or consignor. If there was an error in the account to the amount indicated by the delivery, it is quite clear that it must have been intentional and fraudulent. It could not have been accidental.

The cargo was delivered at Fall River from the vessel into carts. It was suggested that there was a loss of coal in swinging the bucket from the vessel to the carts, by the dropping of coal into the dock. But the loss in this way could have been but a trifle. The carts when loaded were taken, by the direction of the consignee, to Cook's scales, there weighed, the account taken, and then carried to Taylor's coal-yard. The delivery occupied one day and part of another. Taylor engaged Macomber to receive the coal in carts, and Macomber employed six other teams. The depositions of six of the seven teamsters have been taken by the respondent, and they say that all the coal taken by them was weighed at Cook's scales. One of the carters and owners being out of the country, the respondent has not been able to obtain his deposition. Mr. Dunn, the regular clerk to take the account of coal weighed at these scales, was absent at the time of the delivery of this cargo, and the account was taken by three different persons of different portions of the cargo. While the cargo was being weighed and delivered, coal was brought from the yard for consumers, and weighed at the same scales. And it may be further remarked, that there is no positive evidence that the coal taken by Lowney was weighed at these scales.

From this account of the loading and delivery, it appears to be altogether most probable that the error was in the account of the delivery. From the change of the weighers at Cook's scales, of loads from the vessel, and the intermingling of loads for delivery to consumers, an error may be easily supposed to have been made without any imputations of fraud; while if so considerable an error was made at Philadelphia, it must have been fraudulent. A court is more ready to suppose a mistake than fraud, and if the decision is to be by the balance of probabilities, it must be in favor of the master.

---

[1] [Reported by George F. Emery, Esq.]

But there are other considerations that belong to the case. The master is bound to see not only to the receiving personally or by his agent, but also to the proper delivery; he must at his peril deliver it to the consignee named in the bill of lading. But the consignee has also a duty to perform. When he is notified, he must seasonably be on the wharf to receive his goods. Mr. Taylor came there in the morning after the vessel arrived, and sent his teams. The delivery to the teamsters was a delivery to him. Lowney, as well as the others, was in his employment. And if he, as was suggested, may have carried his loads to another, and not to Taylor's yard, though this is certainly not probable, the loss must fall on Taylor, for the master was discharged by a delivery to his teamster.

The principal doubt that I have felt in this case is, whether the master took all that care to see to the accuracy of the account taken, both of the lading and delivery, which is required by law, and by the usage of this trade. If he did not, and the account shows a short delivery, my opinion would be that he must suffer for it, and that his claim for freight must be limited to the amount which he shows to have been delivered. In this case the discrepancy between the two accounts and the uncertainty as to the true amount of the cargo, must be imputed to his neglect. No evidence was offered to a common usage in this respect. It may easily be believed, that much less care is required in the delivery of a cargo of coal, than of a cargo of goods in bales and boxes, the value of which is great in proportion to their volume and weight. In the absence of all proof, I shall take it for granted, that, in this trade, it is usual for the parties to trust to the common weighers and tally men employed at each end of the voyage. In this case, I find it stated by one of the witnesses, that the coal was carried by Taylor's order to Cook's scales to be weighed. If the custom is as I suppose it to be, no satisfactory reason occurs to my mind why one party should, more than the other, be held responsible for the accuracy of the accounts. It is not pretended but that all the coal that was laden was in fact delivered; and if there is no reason for supposing fraud, there can, I think, be but little doubt that the error was made in the account of the delivery. The master is therefore, I think, entitled to full freight, according to his bill of lading. I have little doubt that this decision meets the justice of the present case, but I do not feel quite so much confidence, that it may not relax too much the obligation of the master, as to his care in seeing to the correctness of the accounts of the lading and discharge of his vessel. This obligation may be more or less stringent, according to the nature of the cargo; and it may be more or less affected by the customs of a particular trade. There is no other evidence as to the custom of this trade before me, than what results from the general testimony in the case, and I infer that the coal was received and discharged, and the account taken in the usual manner.

A question was raised on the testimony of Mr. Dunn, who states in substance that, when coal of this kind is accurately weighed, there will be a loss in the delivery of about one per cent; on this cargo a loss of one and one-fifth of a ton. If the question fairly arises in this case, it is argued that freight is due only on the amount delivered, and assuming the account of the lading to be correct, that freight should be allowed on one per cent less. I think otherwise. It has been a question, when goods from natural causes have become deteriorated in the course of the voyage so as to be worthless, whether the consignee may not abandon them for the freight. And it has been held by authors of high authority in maritime law, that he may. But the better opinion, I think, and that supported by the better reasons, is, that he cannot, and that in such a case, the master is entitled to full freight on all that is laden. The loss is not attributable to his fault, but to the intrinsic vice of the goods, and by the principles of natural law, the loss falls on the owner. "Res perit domino." And this decision is conformable to the principles of the contract of hiring. The engagement of the carrier is to transport and deliver the goods. This is the whole of his obligation, and this he has performed so far as depends on him, whether the merchandise is in good condition, or is degraded and deteriorated from natural causes, over which he has no control, and for which he is not responsible. For a like reason in this case, the master is entitled to freight on the whole quantity laden, if it has not been diminished by his fault.

I allow freight for the whole amount borne on the bill of lading, according to the terms of the contract. A claim is made in the libel for three days' demurrage, occasioned by this controversy about the freight. This claim strikes me as a novelty; but, however that may be, I think it ought not to be allowed in this case.